## CHARLES B. DORE *v.* COMMISSIONER OF MOTOR VEHICLES
## (AC 19656)

Schaller, Spear and O'Connell, Js.

Argued January 23—officially released April 3, 2001

*Norman B. Teague,* for the appellant (plaintiff).

*Robert L. Marconi,* assistant attorney general, with whom, on the brief, was *Richard Blumenthal,* attorney general, for the appellee (defendant).

### Opinion

O'CONNELL, J. The plaintiff appeals from the judgment of the trial court dismissing his appeal from the decision of the defendant commissioner of motor vehicles (commissioner) suspending his license to operate a motor vehicle pursuant to General Statutes (Rev. to 1997) § 14-227b (b).[1] The plaintiff claims that the court

---

[1] General Statutes (Rev. to 1997) § 14-227b (b) provides: "If any such person, having been placed under arrest for operating a motor vehicle while under the influence of intoxicating liquor or any drug or both or while his ability to operate such motor vehicle is impaired by the consumption of intoxicating liquor, and thereafter, after being apprised of his constitutional

improperly determined that § 14-227b (j)[2] does not limit the type of evidence that a person can present at an implied consent hearing and (2) relied on evidence that was not permitted by § 14-227b (b) in reaching its decision at the hearing. We affirm the judgment of the trial court.

The following facts are relevant to our disposition of this appeal.[3] At approximately 9:07 p.m. on July 24, 1998, Officer Peter A. Bosco of the Naugatuck police department observed a Ford automobile traveling northbound on Route 8 in the vicinity of exit 29. The vehicle was weaving back and forth between the slow and fast lanes, almost striking another vehicle that was attempting to pass it. The car then made a hard right turn to take exit 29 and struck a partial median on the left side of the ramp. It continued on the ramp approaching Old Waterbury Turnpike with the left front and rear tires traveling over the partial median. Bosco

rights, having been requested to submit to a blood, breath or urine test at the *option of the police officer, having been afforded a reasonable opportunity to* telephone an attorney prior to the performance of such test and having been informed that his license or nonresident operating privilege may be suspended in accordance with the provisions of this section if he refuses to submit to such test or if he submits to such test and the results of such test indicate that the ratio of alcohol in his blood was ten-hundredths of one per cent or more of alcohol, by weight, and that evidence of any such refusal shall be admissible in accordance with subsection (f) of section 14-227a and may be used against him in any criminal prosecution, refuses to submit to the designated test, the test shall not be given; provided, if the person refuses or is unable to submit to a blood test, the police officer shall designate the breath or urine test as the test to be taken. The police officer shall make a notation upon the records of the police department that he informed the person that his license or nonresident operating privilege may be suspended if he refused to submit to such test or if he submitted to such test and the results of such test indicated that the ratio of alcohol in his blood was ten-hundredths of one per cent or more of alcohol, by weight."

[2] In 1998, the legislature amended General Statutes (Rev. to 1997) § 14-227b and redesignated subsection (j) as subsection (*l*) effective January 1, 1999. See Public Acts 1998, No. 98-182, §§ 20, 22. We refer to the subsection as (j) throughout this opinion.

[3] The trial court relied on those facts in its memorandum of decision.

activated his lights and siren, and the Ford drove off the road with the rear of the car jutting out into the roadway. As Bosco approached the vehicle, the driver, who proved to be the plaintiff, yelled, "What the hell did I do wrong?"

Bosco observed that the plaintiff's eyes were extremely glossy and bloodshot, and that he had a strong odor of alcohol on his breath. When Bosco explained why he had stopped him, the plaintiff replied, "Well, don't you think that's a stupid place to put a median?" His words were heavily slurred, and he admitted to having consumed "a few beers." Bosco inquired whether he had any illnesses, medical problems or handicaps that would prevent him from performing field sobriety tests. The plaintiff replied, "No, I should be all set," and then proceeded to fail the field sobriety tests. Bosco placed him under arrest, charged him with operating a motor vehicle under the influence of alcohol in violation of General Statutes § 14-227a[4] and transported him to the Naugatuck police station.

At the station, the plaintiff waived his *Miranda*[5] rights in writing and stated that he had begun drinking at approximately 3 p.m. and had consumed his last beer at 8 p.m. When asked what type of alcoholic beverages he had been drinking, he replied, "Whatever they put in front of me." He advised the police that he was neither injured nor ill, and that he was not taking medication and needed no medication at that time. He also declined to contact an attorney and in response to the police reading the implied consent advisory to him, he stated, "You know I'm going to refuse whatever test you ask.

---

[4] General Statutes § 14-227a provides in relevant part: "No person shall operate a motor vehicle while under the influence of intoxicating liquor or any drug or both. . . ."

[5] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

I beat it last time by refusing, I'll beat it again." He added, "If you [the police] could write a good report the first time, you wouldn't have had to worry about me driving on the streets." When asked to provide a breath sample, he replied, "I am not going to blow; you're wasting your time."

The police reported to the commissioner the plaintiff's refusal to take the chemical alcohol test, and the commissioner initiated a license suspension action. The plaintiff thereafter requested an administrative hearing after which the commissioner, acting through his hearing officer, suspended the plaintiff's driver's license.[6] Pursuant to General Statutes § 4-183, the plaintiff appealed to the Superior Court, which dismissed the appeal on the merits.

The plaintiff's claim at the hearing, as well as on appeal, is that he was exempt from submitting to a Breathalyzer test pursuant to § 14-227b (j), which provides that "[t]he provisions of [§ 14-227b] shall not apply to any person whose physical condition is such that, according to competent medical advice, such test would be inadvisable." In support of his contention that he qualified for an exemption under § 14-227b (j), he submitted to the hearing officer a letter from James E. O'Brien, a physician, to the plaintiff's counsel.

The commissioner does not contend that O'Brien's letter does not constitute competent medical advice. O'Brien's letter unequivocally states that it would have been medically inadvisable for the plaintiff to attempt to perform a Breathalyzer test and sets forth the facts on which his opinion is based together with a thorough

---

[6] The hearing officer made the following subordinate findings:

"1. [The plaintiff] refused to attempt to give a breath test.

"2. [The plaintiff] further stated, 'You know I'm going to refuse whatever test you ask. I beat it last time by refusing, I'll beat it again.'

"3. [The plaintiff] was asked if he was ill, required medication or was injured and answered no to all questions . . . ."

medical analysis.[7] The dispositive issue is whether the
hearing officer should have found that the plaintiff's

[7] O'Brien's letter stated:

"Dear Attorney [Norman B.] Teague:

"I evaluated Mr. Charles Dore in Farmington on September 21, 1998. In addition, I have also reviewed Mr. Dore's medical records consisting of the office records of Dr. George Rubin and Cortland Brown, III, M.D., the Gaylord Hospital Pulmonary Clinic reports and the medical records of St. Vincent Medical Center in Bridgeport regarding his hospital admission dated July 3, 1993 to August 8, 1993. I have also considered the circumstances and activities of Mr. Dore surrounding his arrest on July 24, 1998 for allegedly driving under the influence of alcohol.

"It is my understanding that on July 24th Mr. Dore was suffering an asthmatic attack and because of shortness of breath and wheezing he pulled to the side of the road. Subsequently he was approached by a police officer who, believing Dr. [sic] Dore might be intoxicated, requested that he perform the standard field sobriety tests. Mr. Dore explained that because of his medical problems he could not perform the tests. He was then arrested and taken to the police station and requested to submit to the Intoxilyzer 5000 test. Mr. Dore, who was experiencing severe shortness of breath in part due to transporting dirt prior to the stop, refused to take the breathalyzer test. Mr. Dore, who weighed 200 pounds at the time, had been drinking beer earlier in the day and states he had three 12 ounce beers, one at 1200 hours, one at 1500 hours and the last at 1800 hours.

"In regards to your inquiry as to what effect, if any, Mr. Dore's pulmonary disease would have on his ability to perform the Intoxilyzer test, Mr. Dore's pulmonary disease would make performance of such tests most difficult and medically inadvisable. This is based on his severe pulmonary disease which is further complicated by paralysis of his diaphragm and restrictive airway disease and inhalation of fine dirt particles shortly before the stop.

"Mr. Dore's severe pulmonary disease as documented in the above records are the consequence of a gunshot wound to the chest which resulted in severe restrictions of his vital capacity and an expiration flow rate of merely 120 liters per minute. This is due to both obstructive airway disease and diaphragmatic weakness and partial paralysis. The presence of his symptomatic dyspenia at the time surrounding the incident is attested to by review of pharmacy records showing his use of a Serevent Inhaler, Albuterol Inhaler and a Vanceril Inhaler in the period surrounding the incident. Review of the records also show a FEV, of only 47% of the expected value and forced vital capacity of 74% of normal with a FEV, FVO of 53% normal. These values together with the other clinical data and physical exam, attest to the fact that Mr. Dore does indeed have severe lung disease and particularly when wheezing should not attempt to perform the tests.

"In summary, because of severe pulmonary disease as documented in the records and the findings noted above it would be medically inadvisable for Mr. Dore to attempt to perform a breathalyzer test."

physical condition was such that, according to competent medical advice, taking a Breathalyzer test was inadvisable pursuant to § 14-227b (j).

The hearing officer in this case faced the dilemma of two diverse factual predicates. The first was the police officer's scenario, which describes an operator whom he observed driving on Route 8, whom he pulled over by use of his siren and red lights, and who expressly denied having any illnesses, medical problems or handicaps. O'Brien's letter recites the second factual predicate, which describes a plaintiff who pulled over to the side of the road because he was suffering an asthmatic attack resulting in part from the inhalation of fine dirt particles shortly before the stop. According to O'Brien's letter, the plaintiff was already stopped on the side of the road when the police officer approached. The letter was based on facts and assumptions that were contested.

Should the hearing officer have accepted the police officer's version of having pulled an operator over to the side of the road, or should he have accepted the scenario in O'Brien's letter describing an operator parked on the side of the road having an asthmatic attack? It is the function of the hearing officer to resolve conflicts in the evidence. *Schallenkamp* v. *DelPonte*, 229 Conn. 31, 41, 639 A.2d 1018 (1994). The hearing officer was free to believe the police version of the facts and to disbelieve totally the plaintiff's version.

"Factual determinations of the commissioner must be upheld if there is substantial evidence in the record to support such a finding. . . . An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . Such a standard of review allows less room for judicial scrutiny than does the weight of the evidence rule or the clearly erroneous rule. . . . In determining whether an admin-

istrative finding is supported by substantial evidence, a court must defer to the agency's right to believe or disbelieve the evidence presented by any witness, even an expert, in whole or in part." (Internal quotation marks omitted.) *Lomen* v. *Commissioner of Motor Vehicles*, 61 Conn. App. 213, 218, 763 A.2d 676 (2000).

The plaintiff argues that § 14-227b (j) requires the hearing officer to consider only O'Brien's medical report and bars consideration of the police report. That contention is contrary to firmly established precedent. "Basically, an agency is not required to use in any particular fashion any of the materials presented to it so long as the conduct of the hearing is fundamentally fair." (Internal quotation marks omitted.) *Bancroft* v. *Commissioner of Motor Vehicles*, 48 Conn. App. 391, 400, 700 A.2d 807, cert. denied, 245 Conn. 917, 717 A.2d 234 (1998).

The hearing officer was not bound to consider only the competent medical advice required under § 14-227b (j). Rather, the hearing officer may consider evidence presented by any witness and make his decision in view of all of the evidence. Id., 401.

"Pursuant to the Uniform Administrative Procedure Act, General Statutes § 4-166 et seq., the court may not substitute its judgment for that of the commissioner and must affirm the commissioner's decision unless it is clearly erroneous in view of the reliable, probative and substantial evidence on the whole record . . . . General Statutes § 4-183 (j). In the present case, the court properly concluded that substantial evidence existed to support the commissioner's findings." (Internal quotation marks omitted.) *Tompkins* v. *Commissioner of Motor Vehicles*, 60 Conn. App. 830, 834, 761 A.2d 786 (2000).

The judgment is affirmed.

In this opinion the other judges concurred.